UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SHERIF LATIF, M.D.,                      )
                                         )
            Plaintiff,                   )
                                         )          CIVIL ACTION NO.
VS.                                      )
                                         )          3:11-CV-0104-G
UNIVERSITY OF TEXAS                      )
SOUTHWESTERN MEDICAL                     )
CENTER,                                  )
                                         )
            Defendant.                   )

MEMORANDUM OPINION AND ORDER

Before the court is a motion for summary judgment brought by the defendant

(docket entry 20).  For the reasons set forth below, this motion is granted.

I.  BACKGROUND

This is an employment discrimination case.  The plaintiff, Dr. Sherif Latif

("Latif"), is a doctor of internal medicine.  *See* Brief in Support of The University of

Texas Southwestern Medical Center at Dallas's Motion for Summary Judgment

("Defendant's Brief") at 1 (docket entry 21).  The defendant, The University of

Texas Southwestern Medical Center at Dallas ("UT Southwestern"), operates

residency and hospitalist programs in internal medicine.  *Id.*

### A.  <u>Factual Background</u>

#### 1.  *UT Southwestern's Residency Program in Internal Medicine*

After graduating from medical school and passing the United States Medical

Licensing Exam, a new doctor typically completes some form of graduate medical

education.  Defendant's Brief at 3-4.  Graduate medical education "involves training

doctors in hands-on patient care under the supervision and direction of fully licensed

faculty."  *Id*. at 3.  One of the types of graduate medical education is a residency

program.  *Id*.  A residency program is designed to prepare a doctor to practice in a

specialized area of medical practice.  *Id.* at 5.

UT Southwestern operates a residency program in internal medicine, in which

it is responsible for the academic and clinical training of its internal medicine

residents.  *Id*. at 7.  The director of the residency program in internal medicine is Dr.

Carol Croft ("Croft").  *Id*. at 9.  The internal medicine residency program has a

Committee to Evaluate Clinical Competence ("CECC"), which "determines if [a]

resident has sufficiently developed skills to move on to the next year of his or her

training."  *Id*. at 8.  "The CECC meets regularly throughout the year to evaluate

resident performance, address concerns about residents, and to make

recommendations to the Program Director on issues related to discipline,

professionalism, academic performance, personal issues, etc." *Id*.  The goal of the

internal medicine residency program "is to produce licensed physicians capable of

becoming board certified and of providing quality medical care in their speciality

using independent judgment."  See *id*. at 5.

    "Once a resident successfully completes all years of his residency, and is

certified by the Program Director, he . . . is eligible to take the board exams" in

internal medicine.  See *id.* at 8.  The American Board of Internal Medicine ("ABIM")

administers the process by which a doctor becomes board certified in internal

medicine.  *Id*. at 5.  This process includes an exam which tests internal medicine

certification candidates "on cognitive knowledge and problem-solving ability relevant

to Internal Medicine."  *Id*.

### 2. *Latif's Experience at UT Southwestern*

    Latif "is Arab, Egyptian, [and] of Middle Eastern origin."  Plaintiff's Original

Complaint ("Complaint") ¶ 5 (docket entry 1).  He entered UT Southwestern's

residency program in internal medicine in July of 2007.  Defendant's Brief at 10.  "As

part of accepting his role as a resident, Dr. Latif entered into a contract for his first

year of residency with Parkland [Hospital]."  *Id*.

    Over his three-year residency, Latif had difficulty in acting professionally

towards interns, patients, and nurses.  Defendant's Brief at 10-13.  Latif "ran into

issues with tardiness," and at one point "failed to complete training required by

Parkland and was suspended by it as a result." *Id*. at 11.  Latif used "profane language" as well.  *Id*. at 10.

During Latif's residency, the internal medicine faculty at UT Southwestern carefully monitored Latif's actions and progress.  *Id*. at 10-13.  Croft often directly counseled Latif on his issues, and "set forth an action plan for him to improve his performance."  *Id*. at 11.  At various points, certain faculty committees suggested that Latif seek "mental health assistance" and enroll in "anger management courses."  *Id*. at 12-13.  In March of 2009, Croft considered putting Latif on probation because of the seriousness of his professionalism issues, though she ultimately decided not to do so.  *Id*. at 12.  However, Croft did revoke Latif's moonlighting privileges, which prevented him from working extra shifts at UT Southwestern hospitals to earn more income.  *Id*.  These privileges were reinstated in September of 2009.  *Id*. at 13.

Notwithstanding his problems with professionalism, UT Southwestern offered, and Latif accepted, a position as a hospitalist (a non-tenure track faculty position) in internal medicine.  *Id*. at 2.  This one-year appointment, scheduled to begin on July 1, 2010, was contingent on the successful completion of his residency.  *Id*.

In June of 2010, at the end the final year of his residency, Latif did not successfully complete a required rotation in general medicine consults.  *Id*. at 13.  Latif appears to have failed this rotation due a lack of professionalism, as well as a failure to show up for rounds and "write up required patient notes before his last day

on the service." *Id*. at 13-14.  Because Latif was out of the country, and therefore

could not complete his notes, "[p]atient surgeries had to be cancelled and

rescheduled." *Id*. at 14.

As a result, Latif was forced to "repeat the failed rotation and meet specific

performance expectations and draft[] a corrective action letter." *Id.*  This meant that

Latif could not start his position as a hospitalist on July 1, 2010, when he was

scheduled to begin. *Id*. at 14-15.  Croft also reported Latif's failed rotation to the

Texas Medical Board and the ABIM. *Id*. at 16-17.

From July 6, 2010 to August 3, 2010, Latif completed his make-up rotation.

*Id*. at 15.  During the rotation, he was supervised in part by Dr. Monal Shah

("Shah"), who had been involved in the decision to hire Latif as a hospitalist. *Id*. at

2.  According to the defendant, "Latif did not perform at the level that Dr. Shah

expected him to." *Id*. at 21.  On August 3, 2010, Latif successfully completed his

final rotation, and therefore completed his residency in internal medicine at UT

Southwestern. *Id*. at 16.

After completing his residency, Latif appealed the disciplinary action imposed

on him (*i.e.*, the repeating of the failed rotation) to the CECC. *Id*. at 17.  The CECC

unanimously upheld the decisions to require Latif to repeat the rotation and to report

that fact to the Texas Medical Board and the ABIM. *Id*.  Latif then brought a second

level appeal, which was heard by three internal medicine faculty members. *Id*.  By a

vote of 2-1, the appeal committee affirmed the decision to order a repeat of the rotation. *Id.* at 18. Finally, Latif brought an appeal to Dr. David Johnson ("Johnson"), the Chairman of the department of internal medicine. *Id.* Johnson affirmed the decision as well. *Id.*

After Latif completed his residency, Croft determined that he had not yet met the moral and ethical requirements to sit for the ABIM exam "[b]ecause of his continued lack of professionalism and conduct." *Id.* at 16. Moreover, UT Southwestern decided to revoke its offer to Latif of a hospitalist position. *Id.* at 21. As a result, Latif "instead accepted a position as a physician with the Veterans' Administration hospital." Complaint ¶ 9. Latif claims that this position is "significantly less prestigious," and that he is "making substantially less" money, than the hospitalist position he would have had at UT Southwestern. *Id.*

### 3. *Latif's Allegations of Discrimination*

Latif claims that, during his residency program, he "and other residents of Middle Eastern origin were treated less favorably by UT-Southwestern management." *Id.* ¶ 7. Latif argues that, because of his Arab, Egyptian, and Middle Eastern origin, UT Southwestern forced him to retake his last clinical rotation, denied him the opportunity to take the ABIM examination in August of 2010, and revoked its offer for the hospitalist position. *Id.* ¶¶ 7-8.

In particular, Latif alleges that UT Southwestern treated him less favorably than three other similarly situated medical residents: Dr. Kimber Foust ("Foust"), Dr. Erin Clark ("Clark"), and Dr. John Bahadorani ("Bahadorani").  Plaintiff Sherif Latif, M.D.'s Response to Defendant The University of Texas Southwestern Medical Center's Brief in Support of Summary Judgment ("Plaintiff's Response") at 11 (docket entry 27).  Latif alleges that these three residents are outside of the relevant protected class (*i.e.*, they are not of Middle Eastern descent), and like Latif, had various disciplinary and academic issues while enrolled in the residency program.  *Id.* Nevertheless, he maintains, these residents were not subject to the same disciplinary actions that Latif received.  *Id.*

First, Latif states that he "spoke with Kimber Foust, M.D."  Appendix to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Appendix") at 6 (docket entry 28).  According to Latif, Foust "failed a research rotation in 2010 and was not required to repeat or remediate the failed rotation."  *Id.*  However, Foust "kept her ABIM eligibility and her failure of the rotation was not reported to the Texas Medical Board."  *Id.*  Second, Latif alleges that Clark "acted unprofessionally during an ICU rotation" when she "threw a chart and left the ICU during the middle of her shift abandoning her patient responsibilities." *Id.*  Finally, Latif alleges that Bahadorani "never reported for a month long ICU

rotation and was not forced to remediate it and simply had to hand in a report to satisfy the requirements of the rotation." *Id*. at 6-7.

## B. Procedural Background

On January 17, 2011, Latif filed this employment discrimination suit against UT Southwestern under 42 U.S.C. § 2000e-2(a)(1) ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").  Complaint ¶ 1.

On August 26, 2011, UT Southwestern moved for summary judgment. Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FEDERAL RULE OF CIVIL PROCEDURE 56(a), (c)(1).  A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham.").  To demonstrate a genuine issue of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  The nonmoving

party must show that the evidence is sufficient to support the resolution of the material factual issues in his favor. *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144 (1970)). However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact. See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## II. ANALYSIS

### A. Legal Standard

Latif has brought a claim for unlawful employment discrimination under Title VII.[*] *See* Complaint ¶ 1. Under Title VII, it is "an unlawful employment practice for

---

[*] Claims under Title VII and Section 1981 are analyzed in the same manner. See *Davis v. Dallas Independent School District*, No. 11-10090, 2011 WL 5299663, at *4 (5th Cir. Nov. 4, 2011) ("[T]he inquiry into intentional discrimination is essentially the same for individual actions brought under sections

an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  A plaintiff can "prove a claim of intentional discrimination . . . either by direct or circumstantial evidence." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  When a case is built on circumstantial evidence, this court will evaluate the claim under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973).  *McCoy*, 492 F.3d at 556.

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination.  To make out a *prima facie* case, the plaintiff must show that he or she "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group."  *Id.* at 556-57.

"If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory . . . reason for its employment

---

1981 . . . and Title VII.").

action." *Id*. at 557. "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *Id*.

Finally, "[i]f the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory . . . purpose." *Id*. "To carry this burden, the plaintiff must rebut each nondiscriminatory . . . reason articulated by the employer." *Id*.

## B. Application

In its motion, UT Southwestern provides four arguments why summary judgment should be granted in its favor: (1) Latif is not entitled to sue under Title VII, because there was no employer/employee relationship between him and UT Southwestern; (2) Latif has not made out a *prima facie* case of discrimination, because he has not established that he has suffered an adverse employment action; (3) Latif has not made our a *prima facie* case of discrimination, because he has not established that he was treated less favorably than other similarly situated residents outside the protected class; and (4) UT Southwestern has articulated legitimate, non-discriminatory reasons for its actions towards Latif. Defendant's Brief at 23-32.

### 1. *Employer/Employee Relationship*

UT Southwestern argues that "Dr. Latif cannot make out a claim of discrimination [under Title VII] because he was not employed [by] UT Southwestern

with respect to his residency training -- he was a student." *Id*. at 23.  In contrast, Latif argues that a medical resident is both an employee and a student, and therefore is entitled to bring a cause of action under Title VII.  Plaintiff's Response at 9-10.

Title VII prohibits employers from discriminating against their employees.  *See* 42 U.S.C. § 2000e(f) ("The term 'employee' means an individual employed by an employer.").  The Fifth Circuit does not appear to have directly decided whether a medical resident should be considered an employee under Title VII.  However, in a recent unpublished decision, the Fifth Circuit affirmed a grant of summary judgment against a medical resident in a Title VII discrimination case.  *Gollas v. University of Texas Health Science Center at Houston*, 425 Fed. Appx. 318 (5th Cir. 2011).  In that case, the Fifth Circuit agreed with the district court, which held that the resident failed to establish a retaliation claim under Title VII.  *Id.* at 320.  While the opinion did not address the issue of whether a medical resident is an employee for Title VII, the Fifth Circuit's decision necessarily implies that, because medical residents are entitled to sue under title VII, they must also be considered employees under Title VII.  See also *Zaklama v. Mount Sinai Medical Center*, 842 F.2d 291 (11th Cir. 1988) (allowing a medical resident's Title VII claim to go forward without commenting on the employment status of the plaintiff).

Outside of the Title VII context, medical residents have sometimes been considered employees under federal law.  In *Mayo Foundation for Medical Education and*

*Research v. United States*, __ U.S. __, 131 S.Ct. 704, 715-16 (2011), the Supreme

Court held that a medical resident was an employee for the purposes of a Treasury

Department tax regulation, which required the Mayo Foundation to withhold Social

Security and Medicare taxes from medical residents' paychecks.  In contrast, the Fifth

Circuit has held that "medical residents are not employees protected by the due

process clause."  *Shaboon v. Duncan*, 252 F.3d 722, 732 (5th Cir. 2001) (citing *Davis

v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989)); but see *Ezekwo v. New York City Health

& Hospitals Corporation*, 940 F.2d 775, 785 (2nd Cir.) ("While a medical residency

program is largely an academic undertaking, it also is an employment relationship."),

*cert. denied*, 502 U.S. 1013 (1991).

Having reviewed the available cases, this court concludes that medical residents

are employees for the purpose of suit under Title VII.  The Fifth Circuit's decision in

*Gollas* and the Supreme Court's decision in *Mayo Foundation* strongly suggest that

medical residents are entitled to bring Title VII claims against their employers.

Therefore, Latif is entitled to attempt to bring a claim under Title VII as a medical

resident against UT Southwestern.

### 2.  *Adverse Employment Action*

To establish a *prima facie* case of discrimination, Latif must show that he

"suffered some adverse employment action."  *McCoy*, 492 F.3d at 556.  In Title VII

discrimination claims, "adverse employment actions include only ultimate

employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Id.* at 559.

The Fifth Circuit "has a strict interpretation of the adverse employment element . . . [in a] prima facie intentional discrimination case." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (analyzing a Section 1981 discrimination claim under the *McDonnell Douglas* framework). "Under Title VII principles, . . . an employment action that does not affect job duties, compensation, or benefits is not an adverse employment action." *Id.* (internal citations omitted). "An employer's action does not rise to the level of an 'adverse employment action' when it fails to have more than a 'mere tangential effect on a possible future ultimate employment decision.'" *Mota v. University of Texas Houston Health Science Center*, 261 F.3d 512, 519 (5th Cir. 2001) (quoting *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000)). An actual decision not to promote an employee for a discriminatory reason, for example, would qualify, but a decision made by an employer that limits an employee's opportunities for promotion or lateral transfer would not. See, *e.g.*, *Kirk v. Dry Storage Corporation, Logistics*, No. 4:09-CV-0131-A, 2010 WL 931880, at *4 (N.D. Tex. Mar. 12, 2010) (McBryde, J.).

In this case, Latif alleges three possible adverse employment actions: (1) Croft required Latif to repeat his final rotation; (2) Croft intentionally prevented Latif from taking the ABIM certifying exam in internal medicine; and (3) Latif was not hired by

UT Southwestern as a hospitalist.  Plaintiff's Response at 10-11.  Of these three actions, only the decision to not hire Latif as a hospitalist can be considered an "ultimate employment decision" as a matter of law.  See *Pegram*, 361 F.3d at 282.  In contrast, the decisions to require Latif to repeat a rotation and to prevent him from taking the internal medicine were not ultimate employment decisions.  This is because these decisions were not, in the language of *McCoy*, 492 F.3d at 559, "hiring, granting leave, discharging, promoting, or compensating" decisions.  See, *e.g.*, *Mawaldi v. St. Elizabeth Health Center*, 381 F. Supp. 2d 675, 686-87 (N.D. Ohio 2005) (holding that neither probation nor remediation were adverse employment actions); *Thompson v. Exxon Mobil Corporation*, 344 F. Supp. 2d 971, 982 (E.D. Tex. 2004) (low-level discipline consisting of formal counseling and a report in a personnel file did not constitute adverse employment actions).

### 3.  *Differential Treatment*

Finally, to make out a *prima facie* case of discrimination, Latif must establish that he "was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy*, 492 F.3d at 556-57.  In order to establish this element of his case, a plaintiff must show that a "'similarly situated' employee under 'nearly identical' circumstances, was treated differently."  *Wheeler v. BL Development Corporation*, 415

F.3d 399, 406 (5th Cir.) (quoting *Mayberry v. Vought Aircraft Company*, 55 F.3d 1086, 1090 (5th Cir. 1995)), *cert. denied*, 546 U.S. 1061 (2005).

However, the evidence that Latif has provided is not enough to demonstrate that he was treated less favorably than other similarly situated medical residents outside the protected group.  First, the only evidence concerning the other medical residents comes from Latif's affidavit and deposition testimony.  While it is unclear exactly how Latif learned what happened to Foust, Clark, and Bahadorani, much of it appears to be based on inadmissible hearsay.  For example, Latif appears to have learned about Foust's failed research rotation by speaking directly with her.  Plaintiff's Appendix at 6.  Moreover, Latif appears to have formed the belief that Croft was treating people of Middle Eastern origin differently through conversations with other residents.  Defendant's Brief at 28 (citing sections of Latif's deposition testimony).  Because this evidence would be inadmissible at trial, this court cannot use it in making a decision on a motion for summary judgment.  See *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial.").

Even if the evidence offered by Latif concerning Clark and Bahadorani is admissible, it is not enough to establish a *prima facie* case of discrimination.  This is because a plaintiff must show that a "'similarly situated' employee under 'nearly

identical' circumstances, was treated differently." *Wheeler*, 415 F.3d at 406.  For

example, Latif stated that Clark acted unprofessionally during an ICU rotation.

Plaintiff's Appendix at 6.  This is not enough to show that Clark and Latif were

treated differently, because there is no evidence at all of how UT Southwestern

treated her after this incident.  Moreover, Latif has not established that Bahadorani

was facing "nearly identical circumstances." *Wheeler*, 415 F.3d at 406.  According to

Latif, Bahadorani failed to report for a month long ICU rotation, but was not

required to remediate the missed rotation.  Plaintiff's appendix at 6-7.  Even if these

allegations are true, Bahadorani and Latif's circumstances were quite different.  Latif

did not miss his final clinical rotation -- he failed it.  Furthermore, there is no

evidence concerning whether Bahadorani, like Latif, had disciplinary and

professionalism issues throughout his time at UT Southwestern.

Finally, Latif's evidence concerning Foust and Bahadorani only deals with UT

Southwestern's decision not to require them to repeat or remediate their failed or

missed rotations.  Defendant's Appendix at 6-7.  However, as established above,

requiring a medical resident to repeat or remediate a rotation is not an adverse

employment action under Title VII.  See *supra* section II.B.2.  Latif has provided the

court with no evidence concerning any actual employment actions taken by UT

Southwestern concerning these other residents.

As a result, Latif's evidence concerning Foust, Clark, and Bahadorani is irrelevant to his claim that he was denied a hospitalist position by UT Southwestern. Because Latif has provided no summary judgment evidence on the fourth element of his Title VII claim, he has failed to make out a *prima facie* case of employment discrimination.

4.  *Legitimate, Non-Discriminatory Reasons*
    *for UT Southwestern's Actions*

Because Latif failed to establish a *prima facie* case of discrimination under Title VII, the court does not need to determine whether UT Southwestern has articulated legitimate, non-discriminatory reasons for its actions.

III.  CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment is **GRANTED**.  Judgment will be entered for the defendant.

**SO ORDERED**.

December 2, 2011.

_____
**A. JOE FISH**
**Senior United States District Judge**

- 18 -